UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ROBERTA GAINER,                                    08-CV-0501-WMS-MJR
                        Plaintiff,                 REPORT AND
                                                   RECOMMENDATION
              v.

UNITED AUTOMOBILE AEROSPACE
  AGRICULTURE IMPLEMENT WORKERS
  (UAW) REGION 9 and
GENERAL MOTORS DEPARTMENT OF UAW,

                        Defendants.

## INTRODUCTION

      This case has been referred to the undersigned pursuant to Section 636(b)(1)(A)

and (B) of Title 28 of the United States Code, by the Honorable William M. Skretny, for the

hearing and reporting of dispositive motions for consideration by the District Court.  Plaintiff

Roberta Gainer ("plaintiff"), an African American female who is proceeding *pro se*, alleges

that United Automobile Aerospace Agriculture Implement Workers Region 9 ("UAW Region

9") and General Motors Department of UAW ("UAW GM") (collectively referred to as

"defendants") discriminated and retaliated against her on the basis of her gender and race,

and advanced employment policies with a discriminatory impact, in violation of Title VII of

the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law

("NYSHRL").

      Before the Court is defendants' motion for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure.  (Dkt. No. 201).  Plaintiff filed responses to

defendants' motion on February 13, 17, and 21, 2017 (Dkt. Nos. 206-214), and defendants

filed a reply on April 7, 2017 (Dkt. Nos. 218-223).  Oral argument was heard on April 12, 2017, at which time the Court considered the matter submitted.

For the following reasons, it is recommended that defendants' motion for summary judgment be denied as to plaintiff's Title VII and NYSHRL claims of discriminatory failure to hire, but granted as to all remaining claims.

## SUMMARY OF FACTS AND PRIOR PROCEEDINGS

### *Defendants and their Related Entities*

The International Union United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW") is a labor union which represents thousands of individuals who belong to over 600 local unions in the United States, Canada and Puerto Rico.  (Dkt. No. 201-3, pg. 1).  The UAW provides support for these local unions in organizing new members, community activities, bargaining contracts, handling problems with employers, education, political action and social events.  (Dkt. No. 201-3, pg. 13).  The UAW International Executive Board ("IEB") is the highest governing body of the UAW and is comprised of elected representatives, including a President, Secretary-Treasurer, and multiple Vice-Presidents.  (*Id*. at pg. 5, ¶¶4-5).  The UAW is headquartered in Detroit, Michigan and has at least nine regional offices.  (*Id*. at pg. 4, ¶1).  UAW Region 9 is a UAW regional office, located in Amherst, New York, which serves UAW members in New York, New Jersey, and Pennsylvania.  (*Id*. at pg. 14).

Each UAW regional office is headed by a Regional Director, who also serves as a member of the IEB and who is elected by UAW delegates from that region.  (*Id*. at pg. 5, ¶6).  Regional Directors are responsible for organizational activities within the geographic region.  (*Id*.).  Geraldine Ochocinska served as Regional Director of UAW Region 9 from

June 1998 through June 2006. (*Id.* at pg. 48, ¶3). Joseph Ashton served as Regional Director of UAW Region 9 from June 2006 through June 2010. (*Id.* at pg. 56, ¶3). Scott Adams served as Regional Director of UAW Region 9 from June 2010 through February 2014. (Dkt. No. 201-5, pg. 3, ¶3). Area Directors run sub-offices in smaller geographic areas in each region. (Dkt. No. 201-5, pg. 3, ¶5). Adams was an Area Director for UAW Region 9 from 2006 through January of 2009, and an Assistant Regional Director of UAW Region 9 from January 2009 through June 2010. (*Id.* at ¶3).

General Motors ("GM") manufactures small, mid-size and large automobiles in the United States and international markets. (Dkt. No. 201-3, pg. 16, ¶6). The UAW-GM is the department of the UAW responsible for the bargaining and administration of collective bargaining agreements between the UAW and GM. (Dkt. No. 201-3, pg. 6, ¶8). It is headquartered in Detroit, Michigan. (*Id.*). The UAW Director of the UAW-GM is a UAW Vice President and has primary authority to negotiate and administer collective bargaining agreements between UAW and GM. (*Id.*). Calvin Rapson was assigned to this position by the UAW President from 2006 through July 2010. (*Id.* at pg. 6, ¶7). Rapson's top level staff, at all times relevant to this case, included Garry Bernath, Administrative Assistant, and Ronald Beiber, Assistant Director. (*Id.* at pg. 6, ¶9).

The UAW-GM Center for Human Resources ("CHR") was established, through the partnership and collective bargaining agreement between the UAW and GM, to develop and provide training and education to UAW members who are employed by GM. (*Id.* at pgs. 6-7). The CHR is a non-profit corporation and is financed through GM joint funds. (*Id.* at pg. 7, ¶13). The CHR provides training and programming in areas such as Health and Safety, Joint Activities, Accommodating Disabled People in Transition, Work/Family,

Human Resources Development, Joint Training and Quality Network.  (*Id*.).  The CHR is governed and administered by a joint board of trustees comprised of representatives from both the UAW and GM.  (Dkt. No. 201-3, pg. 72).

### Plaintiff's Employment

On November 1, 1978, plaintiff was hired as an assembler in a GM engine plant located in Tonawanda, New York (plaintiff's "home plant").  (Dkt. No. 208, pg. 9, ¶1).  She was a member of UAW Local 774, under the jurisdiction of UAW Region 9.  (Dkt. No. 201-3, pg. 7, ¶14).  In 1991, plaintiff was asked by the UAW to serve as Human Resources Development Representative ("HRD Rep") for her home plant.  Plaintiff states that while working in this capacity she consulted with local joint leadership, planned and implemented large system changes, attended local joint activity committee meetings, coached and mentored, and created reports and studies for local and national union leadership.  (Dkt. No. 208, pg. 16, ¶10).  Plaintiff also states that in her role as HRD Rep, "in addition to contract administration pertaining to Joint Programs, [she] investigated Paragraph 6a Grievances once [they] reached Step 2 in the Grievance Procedure [and] submitted a Report and Recommendation."  (*Id*. at ¶11).

In 1999, plaintiff was selected to fill a "Special Assigned" position.  (Dkt. No. 201-3, pg. 7, ¶14).  Special Assigned are UAW members from a GM bargaining unit assigned to serve as an appointed representative in an area of joint interest between GM and UAW.  (*Id*. at ¶12).  Special Assigned remain employees of their home plants but are designated for assignment at, and work under the jurisdiction of, the CHR.  (*Id*. at ¶¶12-13).  Special Assigned are appointed by the UAW Director of UAW-GM.  (*Id*. at ¶12).  As Special Assigned, plaintiff worked in the training department of the CHR implementing and

providing various training programs for GM employees represented by the UAW. (*Id*. at ¶14). Plaintiff also provided training assistance as part of the National Paid Educational Leave (PEL) Program for GM plants located in UAW Region 9. (*Id*.). Special Assigned positions could be terminated at any point, either by the UAW or the employee, at which time the employee would return to their prior position at their home plant. (Dkt. No. 201-3, pg. 7, ¶12).

Initially, plaintiff performed her Special Assigned duties at the CHR area center located in Buffalo, New York. (*Id*. at ¶14). In 2003, the CHR closed multiple area centers, including the Buffalo office, and consolidated functions at a central location in Detroit. (*Id*. at ¶15). Special Assigned at the closed centers were given the choice of either relocating to Detroit or returning to work at their home plant. (*Id*.). Defendants submit evidence that when the Buffalo CHR office closed, plaintiff informed Ochocinska, Regional Director of UAW Region 9 at the time, that she was opposed to moving to Detroit. (Dkt. No. 201-3, pg. 50, ¶10). As a result, Ochocinska made arrangements for plaintiff to continue performing her Special Assigned duties from the UAW Region 9 office in Buffalo. (*Id*. at ¶11). Plaintiff maintains, in contrast, that she was willing to relocate to Detroit but was never presented with that option. (Dkt. No. 208, pg. 31, ¶23). Regardless, it is undisputed that after the Buffalo CHR office closed, plaintiff was allowed to perform her Special Assigned duties from the UAW Region 9 office. (*Id*. at ¶¶25-26; Dkt. No. 201-3, pg. 50, ¶11). Plaintiff remained a CHR Special Assigned as well as an employee of GM, and continued to receive her training assignments from the CHR. (*Id*.).

*International Representative Position, First EEOC Charge and Lawsuit*

An International Representative ("IR") is a position within the UAW and IR's are employees of the UAW.  (Dkt. No. 201-4, pg. 34).  IR positions are based either out of a regional office or out of headquarters in Detroit.  (Dkt. No. 201-3, pg. 58, ¶¶15, 16).  The UAW-GM oversees approximately 50 to 60 IR's assigned to the GM department in Detroit.  (Dkt. No. 201-3, pg. 6, ¶10).  In addition, there are approximately 27 IR's working in UAW Region 9.  (Dkt. No. 201-4, pg. 36, ¶3).  No written job description or list of qualifications exists for the IR position.  (Dkt. No. 201-3, pg. 69).  Defendants contend that the duties of an IR are based on customs and practice, and that customs and practice vary throughout the different regions.  (*Id*.).  Defendants further submit that it has become the custom and practice over the last five years for IR's in Region 9 to provide assistance to local UAW unions with contract bargaining and administration as well as grievance arbitration.  (Dkt. No. 201-3, pgs. 50-51, ¶¶12-15; pg. 58; ¶15).   Defendants maintain that, as a result, Region 9 has a history of selecting IR's who have experience in these areas.  (Dkt. No. 201-3, pgs. 69-70).  Defendants explain that individuals gain this experience by serving as elected leaders in their local unions.  (*Id*.).  In contrast, plaintiff submits that the only requirements for the IR position are that the candidate be a member in good standing with the union, possess leadership skills, and "demonstrate willingness to support, advance and carry out all international and local union policies."  (Dkt. No. 208, pgs. 33-34, ¶¶37-38).

The record indicates that in addition to IR's which aid local unions in bargaining and grievance handling, there are also IR's, many of whom worked in the Detroit headquarters, assigned to work in other areas.  (Dkt. No 206, pgs. 33-35, ¶¶53-62; Dkt. No. 201-3; pg. 58, ¶¶16-17).  These other areas include audit, education, organizing, community action

programs, funding, retiree benefits and time study.  (*Id.*).  Although not a model of clarity in this regard, there is evidence in the record to indicate that some of the IR positions which did not focus primarily on bargaining and contract administration were available at the regional level, including in Region 9.  (Dkt. No 206, pgs. 33-35, ¶¶53-63; Dkt. No. 201-3, pgs. 51-52; ¶¶17-18; Dkt. No. 208, pg. 32, ¶¶28-29; Dkt. No. 210-9, pg. 38; pgs. 50-51; ¶¶72-75).  Indeed, plaintiff indicates, in her declaration, that UAW Region 9 was comprised of a Regional Director, four Area Directors, maintenance staff, clerical staff, and IR's in the areas of servicing, organizing, community action programs, retirees, education, auditing and joint programming/training center.  (Dkt. No. 208, pg. 29, ¶¶10-14).

There is no formal posting or application process for IR positions.  The record reflects that Regional Directors typically make recommendations for candidates when an IR position opens in their region, but final appointment requires approval of the UAW President and other members of the IEB.  (Dkt. No 201-3, pgs. 57-58, ¶14).  Regional Directors have no direct authority over IR's working in Detroit, but, they may make suggestions for hires.  (Dkt. No. 201-3, pg. 58, ¶16).  IR appointments in Detroit are handled by the UAW President or UAW Secretary-Treasurer with input from relevant department heads.  (*Id.*).

Although specific dates are not clear from the record, sometime in 2002 or 2003 plaintiff began making inquiries to Regional Director Ochocinska about job openings for an IR. [1]  (Dkt. No. 201-3, pgs. 50-51, ¶¶12-13; Dkt. No. 208, pgs. 31-32, ¶27).  Ochocinska

---

[1]  Plaintiff states that in 2002, she inquired as to an "IR-retiree" position that recently became vacant and was told by Ochocinska to submit an update resume.  (Dkt. No. 208, pg. 32, ¶28)  Plaintiff states that Ochocinska also told plaintiff that "she did not think the retiree [sic] in the Region were ready for a woman."  (*Id.* at ¶29)  Ochocinska states that plaintiff "never contacted her when the work servicing retired members was moved to Region 9."  (Dkt. No. 201-3, pg. 52, ¶18)  However, Ochocinska also indicates that plaintiff submitted a resume for, and expressed interest in, IR positions as far back as 2003.  (*Id.* at ¶14)

avers that she informed plaintiff that an IR position in Region 9 requires experience in collective bargaining and contract administration and that plaintiff did not have the relevant experience or skill set. (Dkt. No. 201-3, pg. 51, ¶14). Ochocinska indicates that she informed plaintiff that in order to be a good candidate, plaintiff should return to her home plant and run for the position of chairperson, which would provide her with experience in negotiations, grievance handling and other contract administration. (*Id*. at ¶15). Ochocinska also told plaintiff that she should consider taking some relevant courses. (*Id*.). Plaintiff disputes these assertions by Ochocinska. Plaintiff states that Ochocinska told her that she would be "good at any of the [IR] vacancies but [Ochocinska's] preference would be for [plaintiff] to be hired as an IR for the Education or CAP [community action program] position." (Dkt. No. 208, pgs. 32-33, ¶¶31-34). Plaintiff further claims that Ochocinska never advised that plaintiff was not qualified for an IR position, nor did Ochocinska advise her to return to her home plant and run for chairperson. (*Id*.).

When Joseph Ashton assumed the Regional Director position in June of 2006, plaintiff continued to express interest in becoming an IR. (Dkt. No. 201-3, pg. 57, ¶14). Ashton states that he also informed plaintiff that she was not a good candidate for a regional IR position since she did not have a strong background in bargaining and administering contracts. (*Id*. at pg. 58, ¶15). Ashton states that he further advised plaintiff that she should follow Ochocinska's advice and return to her home plant and run for local union president or bargaining chair in order to obtain the necessary experience. (*Id*.). Plaintiff denies that Ashton either told her she was not qualified for the IR position or suggested that she run for local union office. (Dkt. No. 212, pg. 5, ¶46). In fact, plaintiff maintains that both Ochocinska and Ashton told her that she was "in line" for an IR position

-8-

and never informed her that she did not have the necessary qualifications.  (*Id*.).  It is undisputed that in or around January of 2007 Ashton told plaintiff he would help her apply for an IR position based in Detroit since those positions, unlike the regional IR positions, encompassed a wider variety of functions and duties and a lack of bargaining experience would be less significant.  (Dkt. No. 201-3, pg. 57, ¶¶15-16; Dkt. No. 201-5, pg. 23).  Ashton states that Gainer responded that she was not interested in moving to Detroit.  (Dkt. No. 201-3, pg. 57, ¶¶15-16).

On July 23, 2006, Jeffrey Pietrzyk, a Caucasian male, was hired as an IR in the Buffalo office of UAW Region 9.  (Dkt. No. 201-3, pg. 59, ¶19).  In that role, he serviced the local unions for all of the GM and Delphi plants in Region 9.  (Dkt. No. 201-3, pg. 62, ¶31).  Prior to acquiring this position, Pietrzyk held various elected offices for his local union including Shop Chairman, Top Negotiator, Sub Counsel 3 and Chairman of the Committee.  (Dkt. No. 201-3, pg. 62, ¶32; Dkt. No. 201-5, pg. 38).  On February 4, 2007, Sergio Acosta, a Hispanic male, was hired as an IR in the UAW Region 9 sub-regional New Jersey office to service local unions in that area.  (Dkt. No. 201-3, pg. 62, ¶36).  Acosta previously held elected positions within his local union, which included serving as Vice President and President for over a decade.  (*Id*. at ¶37; Dkt. No. 206-6, pgs. 2-5).  Acosta avers that as an IR in the New Jersey office, he had "many responsibilities" which included servicing health and welfare and pension plans.  (Dkt. No. 201-6, pg. 3, ¶8).  Acosta also states that his duties included administering contracts, giving bargaining assistance and advice, handling grievance arbitrations "from time to time", advocating for the union at hearings and helping in organizing campaigns.  (*Id*. at ¶9).  Both Pietrzyk and Acosta were recommended by Ashton.  (Dkt. No. 201-3, pg. 62, ¶30).

On July 18, 2007, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that she was denied two IR positions, one in July 2006 and the second in February 2007, because of her race and gender.  (Dkt. No. 1, pgs. 7-9). Plaintiff further charged that defendants had a facially neutral policy which resulted in discrimination.  Specifically, plaintiff claimed that the "unwritten policy" of favoring presidents or chairpersons of local unions for IR positions results in an adverse impact on African American and female candidates, since African American and female candidates are highly unlikely to win a local union election.  (*Id.*).  Plaintiff also alleged that she heard Scott Adams, who was serving as an Area Director at the time of Acosta's appointment, state, in or around February of 2007, "we got our minority [referring to Acosta, a Hispanic male] and now we don't need her [referring to plaintiff]."  (*Id.*).

A number of other IR hires, both for regional offices and the Detroit headquarters, were made during Ashton's time as Regional Director of UAW Region 9. James Gallagher, a Caucasian male, was hired in January 2007 to serve as an IR in the Independent Parts Suppliers ("IPS") department in Detroit.  (Dkt. No. 201-5, pg. 41, ¶6).  His duties in that position included traveling, investigating and studying the time it would take to do tasks, production, line efficiency, and negotiate proper discipline for those who could not keep up with production standards when employers provided insufficient time to complete work. (*Id.* at ¶8).  In 2008, Gallagher moved to an IR position in Region 9 reporting to Ashton. (Dkt. No. 201-3, pg. 62, ¶34).  The record does not make clear as to whether, after transferring to the IR position in Region 9, Gallagher continued in his time study duties or performed other functions.  (Dkt. No. 201-5, pg. 42, ¶10).  Prior to his appointment to an IR position, Gallagher held various elected positions with UAW Local 3303, including

Committeeman, Bargaining Chairperson and President. (Dkt. No. 201-3, pg. 62, ¶35; Dkt. No. 201-5, pgs. 40-42, 45). He had also taken courses in grievance handling and arbitration. (*Id.*). On or about April 13, 2008, Michael Glenning, a Caucasian male whose home union was in Region 9, was hired for an IR position headquartered in Detroit. (Dkt. No. 201-3, pg. 63, ¶¶38-39). Glenning had previously held elected positions in his local union, including Shop Steward, Recording Secretary and President. (*Id.* at ¶40; Dkt. No. 201-6, pg. 7). Glenning also attended the Union Leadership Academy at Penn State University and had taken classes at the University at Buffalo and Cornell. (Dkt. No. 201-6, pg. 7). On or around June 8, 2008, Karl Klaus, a Caucasian male, was also hired as an IR in Detroit working in the Independent, Part and Suppliers ("IPS") department. (Dkt. No. 201-3, pg. 63, ¶41). Sometime thereafter, Klaus moved from the IPS department to an IR position in the Region 9 office in Philadelphia to service contracts for local unions in that area. (*Id.* at ¶42). Klaus' previous experience included serving his local union as Steward, Chief Steward, Bargaining Chairman, Vice Chairman, and President. (*Id.* at ¶43).

On April 26, 2008, plaintiff received a letter from the EEOC indicating that it was dismissing her charge on the basis that it was unable to conclude, based on the information provided, that a statutory violation had occurred. (Dkt. No. 1, pg. 10). Plaintiff was notified of her right to file a court case. (*Id.*). On July 7, 2008, plaintiff filed this lawsuit alleging that she was discriminated against in hiring on the basis of her race and gender. (Dkt. No. 1). She alleged that she had "consistently been denied an International Representative position in favor of approximately 24 Caucasians." (*Id.* at pg. 5). She stated that she was most recently denied IR positions in favor of four Caucasian males and one Hispanic male. (*Id.*).

On or about October 5, 2008, Jamie Leiss, a Caucasian female, was hired for an IR position based in Syracuse, New York, which serviced local unions in that geographic region. (Dkt. No. 201-3, pg. 63, ¶44). Leiss had previously served in elected positions within her local union including Financial Secretary, Office and Clerical Steward, and UAW Local 2149 Bargaining Team. (*Id*. at ¶45, Dkt. No. 201-6, pg. 10). On or about October 5, 2008, Mark Barbee, an African American male, was hired as an IR in the sub-regional New Jersey office. (Dkt. No. 201-3, pg. 64, ¶46). Barbee previously served in elected positions within his local union including Executive Vice President and Chairman of the CAP Committee. (*Id*. at ¶47; Dkt. No. 201-6, pg. 12).

### *GM Bankruptcy and Plaintiff's Removal as Special Assigned*

In November of 2008, GM, along with the rest of the automobile industry, faced a large-scale financial crisis. (Dkt. No. 201-3, pg. 8, ¶16). Sales for GM had fallen approximately 40 percent compared to the previous year. (*Id*.). That same month, GM announced that it was slowing or suspending production at numerous plants, and thousands of UAW members were laid off as a result. (*Id*.). In the fourth quarter of 2008, GM reported an adjusted loss of over 5 billion dollars. (*Id*.). GM sought assistance from the federal government and was required to present a detailed restructuring plan which included cuts to all operations as well as to the funding of the CHR and other joint programs. (*Id*. at ¶¶17-18; Dkt. No. 201-6, pg. 20, ¶6). GM ultimately filed a structured bankruptcy financed through the federal government.[2] (Dkt. No. 201-3, pg. 8, ¶¶17-18). GM eliminated 16 facilities in the United States as well as nameplates such as Saturn,

---

[2] GM was given a federal bridge loan on December 19, 2008.

Pontiac and Hummer. (*Id*.). GM also made large-scale cuts to its work-force, including the reduction of Special Assigned. (*Id*.).

During this time, Rapson, UAW Director of the UAW-GM, served on the Executive Board of Joint Activities with GM counterparts. (*Id*. at ¶19). He was responsible for identifying Special Assigned to be returned to their home plants to reduce costs to the CHR. (*Id*.). In late 2008, Rapson met with his Administrative Assistant, Garry Bernath, and some of his Assistant Directors and instructed them to review the Special Assigned and make recommendations as to which ones should be returned. (*Id*. at ¶20; Dkt. No. 201-6, pg. 3-4, ¶9). As part of this process, Bernath met with UAW-GM Assistant Directors and developed a Special Assigned evaluation form. (Dkt. No. 201-6, pg. 4, ¶10). In October 2008, the evaluation forms were provided to all Assistant Directors who supervised Special Assigned. At that time, Ron Beiber was the Assistant Director of the training program and supervised the ten Special Assigned in that group, including plaintiff. (*Id*. at ¶¶11-13). On November 7, 2008, Beiber submitted his evaluations to Bernath. (*Id*. at ¶13). Beiber rated plaintiff "fair", but indicated that he was unlikely to assign important projects to her. (Dkt. No. 201-6, pg. 29). Beiber noted that plaintiff was the only Special Assigned for training located outside of Detroit and that she did "not [add] much value to CHR activities due to [her] location in Buffalo." (*Id*.). Beiber further indicated that if plaintiff left the department he would not replace her and that he would not recommend her for a staff position. (Dkt. No. 201-6, pgs. 22, ¶¶14, 29). The majority of the evaluations for Special Assigned in the training department were more favorable than plaintiff's, including those of Phillip Glasser and Shelia Anderson. (*Id*. at pgs. 26-41). For example, Beiber indicated that he was likely to assign Anderson important projects and would replace her if she left the training

department.  (*Id*. at pg. 26).  Beiber indicated that he would also replace Glasser, and that

he was extremely likely to assign important projects to Glasser.  (*Id*. at pg. 30).

Bernath also sent Special Assigned evaluation forms to UAW Regional Directors

for the Special Assigned representatives from their geographical region.  (Dkt. No. 201-6,

pg. 22, ¶15).  To this end, an evaluation form for plaintiff was sent to Ashton. (Dkt. No. 201-

3, pg. 60, ¶23).  Ashton met with plaintiff in December of 2008 regarding the evaluation

form and the anticipated reduction of Special Assigned.  (Dkt. No. 201-3, pg. 60, ¶24).

Plaintiff states that Ashton informed her he did not know how to answer one of the

questions on the evaluation, which asked "[h]ow would you rate [the Special Assigned's]

attitude toward the UAW?" (Dkt. No. 201-6, pg. 26; Dkt. No. 94, pg. 8).  Plaintiff states that

Ashton told her that he did not know how to answer this question because plaintiff was

suing the UAW.  (Dkt. No. 94, pg. 8, ¶65).  Plaintiff states that Ashton told her to think

about their meeting over the Christmas holiday and then let him know what she wanted him

to do about the evaluation.  (*Id*. at ¶66).  Ashton avers that the meeting was not about

plaintiff's EEOC charge or lawsuit, but that they did discuss her feelings about the UAW.

(Dkt. No. 201-3, pg. 60, ¶24).  On January 22, 2009, plaintiff wrote Ashton a letter stating

that she loves the UAW and is dedicated to her job.  (Dkt. No. 94, pgs. 38-39).  On

February 9, 2009, Ashton wrote a letter to plaintiff indicating that he had received her letter

and would "take her answers under consideration."  (*Id*. at pg. 40).  Despite the meeting

and subsequent letters between plaintiff and Ashton, it is clear from the record that Ashton

never completed or returned the evaluation form of plaintiff.  (Dkt. No. 201-3, pg. 60, ¶24;

Dkt. No. 201-6, pg. 22, ¶16).[3]  Ashton states that as a Regional Director, he had no authority to appoint or remove Special Assigned.  (Dkt. No. 201-3, pg. 60, ¶23).

In February of 2009, Bernath recommended to Rapson that approximately 30 Special Assigned, including plaintiff, be returned to their home plants.  (Dkt. No. 201-6, pgs. 5-6, ¶17; Dkt. No. 201-3, pg. 9, ¶22).  Anderson and Glasser, both of whom were in the training department and received more favorable evaluations than plaintiff, were also returned to their home plants.  (Dkt. No. 201-6, pg. 22, ¶14).  In making the decision to remove plaintiff from the Special Assigned position, Rapson considered that plaintiff was the only Special Assigned for training not located at the CHR headquarters in Detroit, that she did little training on behalf of the CHR, and that there was very little training needed at that time in Region 9.  (Dkt. No. 201-3, pg. 9, ¶21).  Specifically, a significant number of Region 9 plants whose workers plaintiff trained were closed, in the process of closing, were removed from the GM system, or had their production greatly reduced.  (Dkt. No. 201-3, pg. 60, ¶25).

A subsequent removal of Special Assigned occurred sometime thereafter. Defendants maintain that between 2008 and 2009, a total of approximately 55 Special Assigned, including plaintiff, were removed from their appointments and permitted to either return to their home plant, take a buyout if eligible, or retire.  (Dkt. No. 201-3, pg. 9, ¶¶24-25; pgs. 59-60, ¶¶21-22).  In contrast, plaintiff claims that a total of 20 Special Assigned were removed from their positions around this time.  (Dkt. No. 208, pg. 23, ¶9).

------

[3]  Bernath did speak to the Assistant Director of Region 9, who had no objection to plaintiff returning to her home plant and did not offer information that changed Bernath's recommendation.  (Dkt. No. 201-6, pg. 22, ¶16)

### Retaliation Claim

On March 13, 2009, plaintiff amended her EEOC complaint to include a retaliation charge, which alleged that plaintiff's removal from the Special Assigned position was undertaken in retaliation for her prior EEOC charge and subsequent lawsuit. (Dkt. No. 94, pgs. 19-20). Plaintiff further alleged that the return to the home plant resulted in a 33 percent reduction in her pay. (*Id*.). On April 26, 2009, the EEOC dismissed the retaliation charge on the basis that a federal lawsuit regarding plaintiff's claims had already been filed. (Dkt. No. 94, pg. 22).

### Additional International Representatives Hired

In June of 2010, Scott Adams became Regional Director of UAW Region 9. (Dkt. No. 201-5, pgs. 2-3, ¶3). Adams remained in this role until his retirement in February of 2014. (*Id*.). Two IR's were hired in Region 9 in 2010 following Adams' appointment. (Dkt. 201-3, pg. 64, ¶48). On or about June 20, 2010, Thomas Ashton, a Caucasian male, was hired as an IR based in the Philadelphia, Pennsylvania regional office to service local unions in that geographic area. (*Id*. at ¶50). Previously, Ashton held elected positions in his local union including Steward and Business Agent. (*Id*. at ¶51). On or about September 26, 2010, James Lakeman, a Caucasian male, was hired to an IR position in Region 9 at the Buffalo office. (*Id*. at ¶52). Lakeman's previous experience included serving as Vice President and President of his local union. (*Id*. at ¶53; Dkt. No. 201-6, pgs. 15-16).

## DISCUSSION

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56. A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. App'x 84, 86 (2d Cir. 2011). In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material facts genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988).

Where a plaintiff is proceeding *pro se*, the court must "construe the complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). However, even a *pro se* litigant cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

Here, plaintiff claims that defendants discriminated against her on the basis of race and gender by failing to hire her as an IR, that defendants maintained a hiring policy that had a discriminatory effect on women and African Americans, and that defendants retaliated against her for filing a discrimination charge and lawsuit by removing her as Special Assigned and returning her to the home plant.[4]  Therefore, the claims pending before this Court, which defendants seek to have dismissed in their entirety, are disparate treatment and disparate impact discrimination and retaliation, all in violation of Title VII and the NYSHRL.

### *Failure to Hire (International Representative Position)*

In order for plaintiff to establish a *prima facie* case of failure to hire in violation of Title VII, she must demonstrate that: (1) she was a member of a protected class; (2) she applied, and was qualified for, an open position; (3) her application was rejected; and (4) her rejection occurred under circumstances giving rise to an inference of discrimination. *United States v. Brennan*, 650 F.3d 65 (2d Cir. 2011).  Once a *prima facie* case has been established, "the burden then must shift to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The final burden then falls on plaintiff to offer evidence that defendant's proffered reason was merely a pretext for discrimination.  *Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000).[5]

---

[4]  On June 13, 2011, the Court dismissed plaintiff's causes of action for failure to promote and retaliation.  (Dkt. No. 21)  However, on September 27, 2013, plaintiff was granted leave to re-plead her retaliation claim.  (Dkt. No. 93)  Plaintiff filed an amended complaint on October 9, 2013.  (Dkt. No. 94)

[5]  Claims under the NYSHRL are analyzed under the same standards as claims under Title VII. *Mittl v. N.Y. State Div. of Human Rights*, 100 N.Y.2d 326, 330 (2003); *see also Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) (Second Circuit applies same analytical framework to review claims under Title VII and the NYSHRL).

Here, it is undisputed that plaintiff, an African American female, is a member of a protected class.  It is also undisputed that she pursued various open IR positions with defendants over a number of years and was not hired.  However, defendants argue that plaintiff's *prima facie* claim fails because she was not qualified for the IR position and because she cannot demonstrate that she was denied the position under circumstances giving rise to an inference of discrimination.

The Second Circuit has held that in order for a plaintiff to establish that she was qualified, she must establish "basic eligibility for the position at issue."  *Aulicino v. New York City Dep't of Homeless Servs*., 580 F.3d 73, 81 (2d Cir. 2009).  Eligibility refers to "the criteria the employer has specified for the position, and an employee's subjective belief he was qualified will not suffice."  *Williams v. R.H. Donnelly Corp*., 368 F.3d 123, 217 (2d Cir. 2004).  However, it has also been held that the showing needed at the *prima facie* stage is minimal and that a plaintiff "must show only that he possesses the basic skills necessary for performance of the job."  *Owens v. New York City Housing Auth*., 934 F.2d 405, 409 (2d Cir. 1991).

Here, it is undisputed that no written job description or list of qualifications exists for the IR position.  Moreover, despite the fact that UAW Region 9 employed almost 30 IR's, there is no evidence in the record of any formal posting, application or interview process for the position.  Defendants submit evidence, in the form of declarations by Regional Directors Ochocinska and Ashton, that IR's in Region 9 needed prior experience in bargaining, contract administration and grievance handling and that plaintiff did not possess these qualifications. However, there is also evidence in the record that there were IR positions in Region 9 and in Detroit, such as those focusing on retiree benefits,

-19-

community action programing and education, which did not necessarily require bargaining experience. Indeed, plaintiff contends that in 2002 she expressed interest in an IR position for retirees in Region 9 and was told by Ochocinska to submit a resume.[6]  Plaintiff avers that Ochocinska informed plaintiff that she would be a good candidate for an IR position in education or community action programming, and it is undisputed that Ashton recommended plaintiff for an IR position in Detroit which did not involve extensive bargaining.[7]  Moreover, it is not entirely clear from the record as to whether an IR position in Region 9 which did not focus primarily on bargaining was available during the time period relevant to this lawsuit, or as to whether plaintiff was interested in an IR position headquartered in Detroit or elsewhere which did not require extensive bargaining experience.  Indeed, plaintiff's federal complaint in July 2008 contends that she was denied an IR position "in favor of approximately 24 Caucasian males and most recently 4 Caucasian males and one Hispanic male." (Dkt. No. 1, pg. 5).  Based upon the evidence submitted by defendants, at least three of the Caucasian males hired immediately prior to plaintiff's lawsuit and during the relevant time period, Gallagher, Glenning and Klaus, were initially hired to fill IR positions in Detroit.  It appears that Glenning remained in Detroit while Klaus and Gallagher were eventually transferred to Region 9.  The record is further unclear as to whether Gallagher was servicing local unions after the transfer to Region 9

---

[6]  While the hiring of an IR for retirees in 2002 occurred outside the statute of limitations for purposes of plaintiff's failure to hire claim, the fact that plaintiff pursued this position demonstrates her interest in IR positions in Region 9 that did not encompass only bargaining, and therefore is relevant in considering the range of IR positions she sought and whether she was qualified for them.

[7]  Plaintiff's complaint alleges that she was interviewed for various IR positions including Retiree Director, Education Director, Auditor/Strike Assistance, Servicing Rep and Funding Rep.  During oral argument, defendants stated that plaintiff was never interviewed for an IR position.

or continuing his time-study work, which does not appear to have directly encompassed bargaining. (Dkt. No. 201-3, pg. 62, ¶34).

In addition, plaintiff disputes that she was not qualified for an IR position based upon her lack of bargaining experience. She states, in her declaration, that both Ochocinska and Ashton told her she was qualified and "in line" for an IR position. Plaintiff also submits, in her declaration, that while serving as HRD Rep she engaged in contract administration and responded to grievances.[8]

In sum, while there is evidence in the record that bargaining experience was preferable for candidates for IR positions in Region 9, there is no definitive proof, such as a job description or list of qualifications, that it was a prerequisite. There is also evidence that some IR positions in Region 9, as well as IR positions in Detroit, did not focus primarily on contract negotiation and administration, and there are questions of fact as to whether any of those positions were available, and sought by plaintiff, during the relevant time period. Further, plaintiff submits that she had some of the relevant experience specified by Ashton and Ochocinska, specifically contract administration and responding to grievances, through her prior position as HRD Rep. For all of these reasons, and in consideration of the minimal burden required at the *prima facie* stage, the Court cannot find, as a matter of law, that plaintiff does not have the "basic qualifications necessary" for

---

[8] Defendants argue that the Court should deem all facts in defendants' statement of material facts admitted, since plaintiff's statement of facts, and responses to the summary judgment motion in general, do not comply with Rule 56 of the Federal Rules of Civil Procedure by "specifically controverting" any of defendants' stated facts or properly supporting any claimed dispute of facts. The Court denies this request and finds that to the extent that plaintiff's declaration relies on her own personal knowledge or statements made to her by defendants, plaintiff has submitted admissible evidence in opposition to defendants' motion. *See Collins v. Cohen Pontani Lieberman & Pavane*, 04 CV 8983, 2008 U.S. Dist. LEXIS 58047 (SDNY July 31, 2008) (Wood, D.J.) (rejecting defendant's argument that summary judgment should be granted because plaintiff's statement of facts cites to a "self-serving" declaration and finding instead that "plaintiff's declaration is admissible evidence and it is for a jury to determine whether plaintiff's allegations are true or merely self serving").

an IR position. *See DeMarco v. Stony Brook Clinical Practice Management Plan and Research Foundation of the State University of New York*, 348 Fed. App'x 651 (2d Cir. 2009) (overturning summary judgment finding by district court on failure to hire claim where there was "sufficient evidence in the record for the question of [plaintiff's] qualifications to be submitted to a jury"); *Small v. New York*, 12-CV-1236, 2017 U.S. Dist. LEXIS 47957 (WDNY March 30, 2017) (Skretny, D.J.) (because material questions of fact remain as to whether plaintiff established a *prima facie* case, as well as whether defendants had a legitimate, non-discriminatory reason for taking adverse action, summary judgment was denied).

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employees' protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [failure to hire.]" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Plaintiff alleges that in February of 2007, shortly after a Hispanic male was hired for an IR position which she had sought, Scott Adams stated something to the effect of "we have our minority and now we don't have to worry about her [referring to plaintiff]." Defendants submit that Adams denies making this statement and that, in any event, he had no authority to appoint or remove IR's in Region 9 at the time he allegedly made the comment.

To determine whether a remark is "probative of discrimination" or merely a "non-probative stray remark", courts consider the following: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low level employee); (2) when the remark was made in

relation to the employment decision at issue; (3) the content of the remark (whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharms.*, 616 F.3d 134, 149 (2d Cir. 2010). Here, Adams' alleged remark was made in relation to the employment determination close in time to when the decision was made, referenced the decision-making process, and could reasonably be viewed as discriminatory. Adams was an Area Director of Region 9 at the time he allegedly made the remark and later served as Assistant Regional Director from January 2006 through June 2010 and Regional Director from June 2010 until January 2014. While Adams states that he had no authority to "hire appoint or remove" an IR while serving as Area Director and Assistant Regional Director, he was a supervisor with a management position during this time period. Plaintiff states, in her declaration, that Area Directors are part of the decision-making process for hiring in Region 9 and assert "strong influence in making recommendations." (Dkt. No. 212, pg. 8, ¶86). Construing the facts in the light most favorable to plaintiff, the Court notes that Adams had the ability to recommend IR's during a time period relevant to this lawsuit, was a supervisor with influence over the hiring process in Region 9 at the time he allegedly made the remark and while plaintiff was seeking the position of IR, and the remark was directly dismissive not only of plaintiff's selection as an IR but also pejorative of minorities in general. Taking into account the minimal burden attributable to plaintiff at the *prima facie* stage and the Court's duty to construe all facts in the light most favorable to plaintiff, Adams' comment is sufficient to establish an inference of discrimination. *See Bucalo v. Shelter Island Union Free Sch. Dist.,* 691 F.3d 119, 128 (2d Cir. 2012) ("The requirements to establish a *prima facie* case

are minimal, and a plaintiff's burden is therefore not onerous."); *Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015) (There is "no bright-line rule for when remarks become 'too attenuated' to be significant to a determination of discriminatory intent."); *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d. 244, 277 (EDNY 2013) ("Supervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made.") (internal citations omitted); *Daniel v. ABM Industries, Inc.*, 16-CV-1300, 2017 U.S. Dist. LEXIS 50132 (SDNY March 31, 2017) (Abrams, D.J.) (plaintiff established *prima facie* case of discrimination where allegations suggested that employee with supervisory authority criticized co-worker's performance in language with racial overtones, a supervisor cited that language in warning plaintiff, and plaintiff was terminated a short time later). For all of these reasons, the Court finds that plaintiff has set forth a sufficient *prima facie* claim of failure to hire to avoid summary judgment.

Turning to the next phase of the *McDonnell Douglas* analysis, defendants' evidence that plaintiff was not hired for an IR position because she did not have experience in bargaining and contract administration, and that they hired candidates who did, establishes a legitimate, non-discriminatory reason for defendants' failure to hire plaintiff as an IR. *See Holt-KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996) ("A candidate's superior qualifications can be a legitimate non-discriminatory reason."); *Davis v. State Univ. Of New York*, 802 F.2d 638, 641 (2d. Cir. 1986) (holding that the defendant met its burden of providing a legitimate, non-discriminatory reason for rejecting an employee where it selected the "best-qualified candidate"); *Meyer v. McDonald*, 15-CV-1496, 2017 U.S. Dist. LEXIS 39766 (EDNY March 20, 2017) (Weinstein, D.J.) ("Interviewing and hiring a candidate with superior qualification to plaintiff is a legitimate, non-discriminatory reason

for failing to hire plaintiff."); *Schwartz v. York Coll.*, 06 Civ. 6754, 2011 U.S. Dist. LEXIS 93495 (EDNY Aug. 22, 2011) (Mauskope, D.J.) (finding a legitimate, non-discriminatory basis for hiring individual over plaintiff when individual's "previous work experiences matched the demands of the position more closely than plaintiff's").

Since defendants have set forth a legitimate, non-discriminatory reason for their failure to hire her as an IR, the burden returns to plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered were in fact a pretext for discrimination. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005).   A plaintiff can demonstrate pretext through either direct evidence or through indirect or circumstantial evidence which may include "illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons."  *Bagley v. J.P. Morgan Chase & Co.*, 10-cv-1592, 2012 U.S. Dist. LEXIS 97045 (Gardephe, D.J.) (SDNY July 12, 2012).  At the pretext stage, the court may "re-consider evidence presented to find an inference of discrimination at the *prima facie* stage."  *Ingenito v. Riri USA, Inc.*, 11-CV-2569, 2013 U.S. Dist. LEXIS 27333 (EDNY Feb. 27, 2013) (Brodie, D.J.)  Finally, a plaintiff's evidence at the third step of the *McDonnell Douglas* analysis must be viewed as a whole rather than in piecemeal fashion.  *Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).

Here, viewing the evidence in the record as a whole and construing the facts in a light most favorable to plaintiff, the Court finds that there are sufficient issues of material fact to raise a question of pretext and to prohibit summary judgment in favor of defendants. Defendants emphasize that the other IR candidates were more qualified than plaintiff

because of their bargaining and contract administration experience, and that, in failure to hire cases, it is not the function of courts to act as "super-personnel" departments. However, as explained in detail above, there is a question of fact as to whether all relevant and available IR positions involved extensive bargaining and therefore required this type of experience.  In addition, plaintiff's own averments that she was told she was qualified and "next in line" for the position and that she had some of the relevant experience through her prior position as HRD Rep, in contrast with defendants' evidence that plaintiff was told repeatedly she was not qualified, present credibility determinations best left to the jury. These questions of fact, combined with the lack of any formal job description, list of requirements, or application and interview processes undermines defendants' proffered reason for their hiring determinations.  *See Byrnie*, 243 F.3d at 103 (while a court "must respect the employer's unfettered discretion to choose among qualified candidates...an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision").

Moreover, plaintiff need not prove that she was more qualified than the other candidates, or that no reasonable person would have chosen the other candidates over her, since there is additional evidence in the record to support a claim of pretext.  *See Collins v. Cohen Pontani Lieberman & Pavane*, 04 CV 8983, 2008 U.S. Dist. LEXIS 58047 (SDNY July 31, 2008) (Wood, D.J.) (it is only when a plaintiff seeks to prove discrimination solely through a discrepancy in qualifications that she must demonstrate that "her qualifications were so superior to the persons selected that no reasonable person could have chosen the candidate selected over her but for gender bias"); *Sandor v. Safe Horizon, Inc.*, 08-CV-4636, 2011 U.S. Dist. LEXIS 3346 (EDNY Jan. 13, 2011) (Gold, M.J.) (where

plaintiff offered additional circumstantial evidence of pretext, she did not have to demonstrate that "no reasonable person" would have selected her competitor).  In *Walsh v. New York City Housing Authority*, the Second Circuit reversed a district court's finding of summary judgment as to a discriminatory failure to hire claim and held that the trier of fact could "properly consider the dearth of female bricklayers as one component of its cumulative injury" as to whether defendant's legitimate non-discriminatory reason for failure to hire plaintiff was pretextual.  828 F.3d 70 (2d Cir. 2016).  Similarly here, plaintiff avers that defendants have never hired an African American female as an IR in Region 9 and defendants have not offered evidence to the contrary.  Instead, defendants point to the hiring of a Caucasian female and an African American male for IR positions in 2008.  However, both of these hires occurred after plaintiff filed her initial EEOC charge and this lawsuit.  Adams' remark about having their "minority" and not needing plaintiff serves as further proof of pretext.  As explained above, Adams was the Regional Director of Region 9 during some of the time period relevant to this lawsuit and was a supervisor in the office, with alleged influence over hiring decisions, when this remark was allegedly made.  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) ("[E]ven if one stray remark is by itself insufficient proof, it may bear a more ominous significant when considered within the totality of all the evidence."); *Smith v. K&F Indus.*, 190 F. Supp. 2d 643, 651 (SDNY 2002) ("Where the offensive remarks are combined with other evidence of discriminatory intent, courts are reluctant to grant summary judgment for the defendant.")  Indeed, while Adams served as Regional Director of UAW Region 9, he recommended two Caucasian males for IR positions.

The Second Circuit has made clear that in order to avoid summary judgment a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). Admittedly, the Court is presented with a close case here. Defendants have submitted significant evidence that the individuals hired as IR's over plaintiff had superior experience in collective bargaining and contract administration through holding offices in their local unions, and that these qualifications were sought after for IR's in Region 9. However, there is conflicting evidence in the record regarding the types of IR positions available and sought by plaintiff, the requirements for and duties of those positions, and plaintiff's prior experience and qualifications. There is conflicting testimony in the record about what plaintiff's supervisors told her with respect to whether she was qualified and "in line" for an IR position and, significantly, there is conflicting testimony regarding a discriminatory comment by Adams regarding plaintiff and the hiring of minorities. There is also evidence that Region 9 had never hired an African American female as an IR. These conflicts represent issues of fact and credibility determinations that can only be resolved by a jury and, depending on the outcome, could lead a reasonable person to conclude that discrimination, while possibly not the only consideration, was a motivating factor in the decision not to hire plaintiff. For these reasons, it is recommended that the Court deny defendants' summary judgment motion as to the failure to hire claim pursuant to Title VII and the NYSHRL.

*Disparate Impact*

Unlike claims alleging intentional discrimination based upon race or gender, "disparate impact claims are concerned with whether employment practices that are neutral on their face and were not intended to discriminate nevertheless had a disparate effect on the protected group." *See Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971). To establish a *prima facie* case of disparate impact, a plaintiff must show that a facially neutral policy or practice has a significant disparate impact on the basis of a protected characteristic. *Id.* at 430-32. Specifically, a plaintiff must: (1) identify a specific employment practice or policy; (2) demonstrate a disparity exists; and (3) establish a causal relationship between the two. *Chin v. Port Auth. of N.Y. and N.J.*, 685 F.3d 135, 151 (2d Cir. 2012).[9] Defendants argue that plaintiff has not identified a facially neutral employment policy which creates an adverse impact upon African Americans or women. While plaintiff's response in opposition to summary judgment does not identify a specific policy or practice, plaintiff's initial EEOC charge alleges that defendants' unwritten policy that IR candidates must have bargaining experience disproportionately affects African Americans and women, because those groups are less likely to be elected to leadership positions in their local unions. Plaintiff has arguably identified a neutral employment

---

[9] Disparate impact claims under the NYSHRL are analyzed as they would be under Title VII. *Teasdale v. N.Y. City Fire Dep't, FDNY*, 574 Fed. App'x 50, 52 (2d Cir. 2014).

policy.[10]  However, she does not successfully establish the remaining elements of a *prima facie* claim of disparate impact.

After identifying a specific employment practice, "plaintiffs then must present statistical evidence of a kind and degree sufficient to show the [policy] in question has caused the exclusion of protected groups." *Smith v. Zerox Corp*., 196 F.3d 358, 365 (2d Cir. 1999).  Allegations which contend only that there is a bottom line racial imbalance in the workforce are insufficient.  *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 159 (2d Cir. 1991).  Here, plaintiff makes general, conclusory allegations that UAW Region 9 has never hired an African American female for an IR position and has only hired five females to the position.  Plaintiff also submits declarations from a number of African American men and women who were not offered IR positions.  Plaintiff submits no evidence as to the relevant labor pool either inside or outside of Region 9, the composition of the UAW workforce in general, or the qualifications of the other candidates.  In fact, a number of the individuals who submitted affidavits do not indicate that they actively pursued IR positions but instead state they were not "approached" about them.  It is also unclear as to what specific positions some of the affiants were seeking as well as the gender, race or qualifications of those hired instead.[11]  *See Hazelwood Sch. Dist. V. United States*, 433

---

[10]  In discussing her disparate impact claims, plaintiff also makes conclusory and general references to "pattern and practice" and alleges that defendants' "discriminatory behavior...severely impacted" women and African Americans.  To the extent that plaintiff is attempting to allege pattern and practice discrimination as an independent basis for liability, the claim should be dismissed.  *Chin*, 685 F.3d at 150 ("Outside of the class context...private plaintiffs may not invoke the [pattern and practice] method of proof as an individual and distinct method of establishing liability."); *Heap v. County of Schenectady*, 214 F. Supp. 263 (NDNY 2002) (dismissing plaintiff's "pattern or practice claim" because "such a claim is improper in the context of an individual disparate treatment claim").

[11]  Although not entirely clear, plaintiff's memorandum of law seems to cite two instances where defendants hired Caucasian men for Special Assigned Benefit Representative positions instead of two more qualified African American women.  These allegations are not only conclusory and unsupported by evidence, but also do not involve IR positions.

U.S. 299 (1977) (appropriate comparison was between the racial composition of the school's teaching staff and the racial composition of the qualified public school teachers in the relevant labor market); *Wainsome v. Port Authority of New York and New Jersey*, 948 F.2d 1370, 1370 (2d Cir. 1991) (in disparate impact case, appropriate population was all black candidates who sought promotion to the composition of those candidates actually promoted).   Plaintiff's proof of a disparity is further insufficient because there is no evidence in the record that any African American or female candidate, other than plaintiff herself, was not hired as an IR specifically because of lack of bargaining experience.  *See Williams v. Potter*, 3:03 CV 1640, 2007 U.S. Dist. LEXIS 8136 (D. Conn. January 29, 2007) (Droney, D.J.) ("Any statistical evidence offered must also establish the link between the identified policy and the disproportionate impact.")

Even if plaintiff had come forward with sufficient statistical evidence, the disparate impact claims still should be dismissed because there is no causal connection between the neutral employment policy and the lack of African Americans or women in IR positions. There is no evidence in the record that African Americans or women were under-represented in union leadership or that it was "difficult" for them to get elected to local positions.  In fact, the affiants here, all of whom are African American men or women, held elected positions in their local unions, including steward, committee-person, trustee, vice-president or president.  Thus, there is no connection between defendants' requirement that candidates have bargaining experience and an alleged underrepresentation of women or African Americans in IR positions.  *See Lopez*, 930 F.2d at 159 (the "causal connection" requirement of Title VII "recognizes that underrepresentation of blacks might result from any number of factors, and it places an initial burden on the plaintiff to show that the

specific factor challenged under the disparate impact model results in discriminatory impact."); *Davis v. City of New York*, 99 Civ. 4955, 2003 U.S. Dist. LEXIS 21337 (SDNY November 25, 2003) (Jones, D.J.) (granting defendants' summary judgment motion as to plaintiff's claim that city's drug testing policy of applicants had a disproportionate affect on African Americans because "plaintiff fail[ed] to cite any statistics from which a discriminatory impact could be inferred and even fail[ed] to cite even one other specific instance when a person of any race had trouble with the NYPD's drug test due to a lack of sufficient body hair.")

For these reasons, it is recommended that the Court grant summary judgment as to plaintiff's disparate impact claims under both Title VII and the NYSHRL.

### Retaliation: Joint Employer

Defendants argue that plaintiff's retaliation claim must be dismissed because she has failed to establish that she was employed by defendants.  The definition of employer is construed liberally for Title VII purposes and does not require a direct employer/employee relationship.  *Lima v. Addeco*, 634 F. Supp. 2d 394, 399 (SDNY 2009).  The term employer "is to be viewed functionally, to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment." *Id*.  Separate legal entities are considered joint for employment purposes when they "handle certain aspects of their employer-employee relationship jointly."  *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132 (2d Cir. 1985) (internal citations omitted).  Indeed, the Second Circuit has held that the joint employer doctrine is operative where "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the

conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Arculeo v. On-Site Sales & Marketing*, LLC, 425 F.3d 193, 198 (2d Cir. 2005).   To determine whether an entity can be considered a joint employer, courts evaluate whether the alleged joint employer: (1) possessed the power to hire and fire the employee; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Velez v. Sanchez*, 693 F.3d 308, 326 (2d Cir. 2012).   The essential element is "immediate control over employees." *Woodman v. WWOR-TV, Inc*., 411 F.3d 69, 89 (2d Cir. 2005).  A similar standard is utilized for determining whether an employment relationship exists under the NYSHRL.  *See MacSweeney v. ING Life Ins. & Annuity Co.*, 11 CV 971; 2011 U.S. Dist. LEXIS 117538 (EDNY October 12, 2011) (Briccetti, D.J.) (To determine whether a defendant is an employer within the meaning of the NYSHRL, courts examine whether the alleged employer had the power to hire and fire, paid wages, and controlled the employee's conduct, with the question of control being the most important);  *Scott v. Mass. Mut. Life Ins. Co.*, 86 N.Y.2d 429, 433 (1995) ("a determination that an employer-employee relationship exists may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results").

Here, plaintiff remained a GM employee while serving as Special Assigned to the CHR, which is an entity created and governed jointly by GM and the UAW.  Plaintiff's duties involved training defendants' members, and she was both appointed and removed from the position by the UAW Director of UAW-GM, an employee of the UAW.  As to

control over plaintiff's schedule and duties, plaintiff worked in defendants' UAW Region 9 office and was supervised by Beiber, Assistant Director of the training department and an employee of the UAW.  Plaintiff was not performing GM plant work but was instead implementing training programs at the direction of a UAW supervisor or manager.  In addition, when the reduction in Special Assigned occurred, plaintiff's employment and performance were evaluated by UAW-GM supervisors employed by the UAW, rather than GM employees.  Plaintiff and defendants dispute as to whether she was paid by GM or through the CHR joint funds.  Plaintiff maintains that her work assignments, hours, compensation, vacation approvals and other day to day activities were controlled by UAW supervisors.  Indeed, there is enough evidence here to raise a question of fact as to whether defendants had sufficient control over plaintiff to be considered a joint employer for purposes of Title VII and the NYSHRL.  *See Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 611 F. Supp. 344, 349 (SDNY 1984) ("When an employer has the right to control the means and manner of an individual's performance...an employer-employee relationship is likely to exist."); *N.L.R.B. v. Solid Waste Servs., Inc*., 38 F.3d 93, 94 (2d Cir. 1994) (determining whether an entity may be considered a joint employer is "essentially a factual issue").  For these reasons, defendants' request that the Court dismiss the retaliation claims on the basis that plaintiff was not employed by defendants should be denied.

### *Retaliation: Merits*

To demonstrate a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of the protected activity; (3) the employer took adverse action; and (4) a causal connection exists between the protected

activity and the adverse action. *Distasio v. Perkin Elmer Corp*., 157 F.3d 55, 66 (2d Cir. 1998). This showing creates a presumption of retaliation, which the defendant must rebut by establishing a legitimate, non-retaliatory basis for the adverse action. *Chem v. City University of N.Y.*, 805 F.3d 59 (2d Cir. 2015). If such a basis is provided, the presumption of retaliation dissipates, and the plaintiff must show that the protected activity was the but-for cause of the action. *Id*.[12]

Here, it is undisputed that plaintiff engaged in protected activity when she: (1) filed an EEOC charge in July 2007; (2) filed this lawsuit in July 2008; and (3) filed a second EEOC charge in March 2009. It is also undisputed that defendants knew of plaintiff's charge and lawsuit and that she suffered an adverse action in February 2009, specifically her removal from the Special Assigned position and return to the home plant.

Defendants argue that plaintiff fails to establish a *prima facie* claim of retaliation because she has not alleged any causal connection between the protected activity and adverse action. The Second Circuit has consistently held that "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec.*

---

[12] This same burden shifting framework also applies to retaliation claims asserted pursuant to the NYSHRL. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). With regard to causation, in 2013 the Supreme Court clarified that with respect to a Title VII retaliation claim, a plaintiff must establish that the protected activity was the "but-for" cause of the adverse employment action, as distinct from the prior standard, which required only that the protected activity be a "motivating factor" in the employment decision. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). "Although New York State Courts have yet to address the impact of the Supreme Court's holding in *Nassar* on the NYSHRL, nor has the Second Circuit provided...guidance as to the issue, this Court will continue to construe the NYSHRL as requiring the same elements as Title VII." *Verga v. Emergency Ambulance Serv.*, 12-CV-1199, 2014 U.S. Dist. LEXIS 161512, at *9 (EDNY 2014) (Hurley, D.J.); *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 592 (WDNY Sept. 30, 2015) (Wolford, D.J.) *See Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 847 n. 7 (2d Cir. 2013) (declining to address whether *Nassar* applies to NYSHRL claims). The Court further notes that even if it were to consider plaintiff's NYSHRL retaliation law claims under the more lenient "motivating factor" standard, plaintiff still would have failed to provide sufficient evidence of pretext to survive summary judgment.

*Co.*, 252 F.3d 205, 217 (2d Cir. 2001). In addition, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Here, plaintiff was returned to her home plant in February of 2009, a year and a half after she filed her first EEOC charge and seven months after filing this lawsuit. Based upon relevant case law and the specific circumstances of this case, including the allegations that Ashton mentioned plaintiff's lawsuit when discussing the reduction in Special Assigned, the Court finds that an adverse action occurred close enough to plaintiff's protected activity to establish a causal connection. *See Summa*, 708 F.3d at 115 (seven-month gap between federal lawsuit and termination of plaintiff was not "prohibitively remote" to bring a retaliation claim); *Espinal*, 558 F.3d at 129 (passage of "only six months" was "sufficient to support an inference of a causal connection"); *Caputo v. Copiague Union Free Sch. Dist.*, 15-5292, 2016 U.S. Dist. LEXIS 153243 (EDNY November 4, 2016) (Hurley, D.J.) (seven month gap not too attenuated to preclude showing of causal relationship between plaintiff's protected activity and adverse employment action, especially when viewed together with other allegations); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory action adequate to establish a causal connection).

While plaintiff has established a *prima facie* claim of retaliation, defendants have set forth a legitimate, non-retaliatory reason for the adverse employment action. Defendants submit extensive evidence that GM experienced a significant economic downturn in 2008 which forced them to make substantial cuts in production and a number of other areas,

including funding of the CHR.  As a result, approximately 30 Special Assigned, including

plaintiff, were removed from their positions with the CHR and returned to employment at

their home plants in February of 2009.  In determining who would be removed, Special

Assigned were evaluated using standard, objective criteria.  Defendants also submit

evidence that, at the time of the reduction, there was a decreased need for training in

Region 9 since a number of plants there had been closed, and plaintiff was the only

Special Assigned from the training department located there.  *See Delaney v. Bank of Am.*

*Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (a company-wide reduction in force is a legitimate,

non-discriminatory reason for employment termination); *Abdu-Brisson v. Delta Air Lines,*

*Inc.*, 239 F.3d 456, 469 (2d Cir. 2001) ("economic concerns can be a legitimate business

reason for adverse action"); *Alman v. HSBC Bank USA, N.A.*, 07 Civ. 3540, 2009 U.S. Dist.

LEXIS 89438 (SDNY August 13, 2009) (Francis, M.J.) ("A reduction in force may be a

legitimate, non-discriminatory reason to dismiss employees, as long as the company

chooses which employees to dismiss on a non-discriminatory basis.")

In an attempt to show pretext, plaintiff argues that GM's financial situation was not

as dire as set forth by defendants and that Special Assigned were hired around the time

that her position was eliminated.  However, the documents cited by plaintiff confirm

defendants' representations of the circumstances of the reduction.  Minutes from a CHR

Board of Trustees meeting in March of 2008 indicate that any increases in training

expenditures were the result of contractual commitments such as updating course

materials and increasing programs, and do not appear to be related to staffing in the

training department.  (Dkt. No. 206, pg. 145).  Minutes from a CHR Board of Trustees

meeting in March 2009 indicate that staff for the CHR increased between the end of 2007

and the end of 2008. (Dkt. No. 206, pg. 154). However, there is no evidence that this increase was in the training department. Indeed the minutes further indicate that "proposed 2009 budget reflects a 10% overall staff headcount reduction" and that "additional reductions will be made." (*Id.*). Further, while plaintiff appears to dispute the exact number of Special Assigned who had their positions eliminated, she does not dispute that at least 20 Special Assigned were affected by the reduction in force. (Dkt. No. 212, pg. 10; ¶114). *See Douyon v. N.Y. City Dep't of Educ.*, 665 Fed. App'x 54 (2d Cir. 2016) (where record was clear that plaintiff lost her job as a result of a pre-planned, organization-wide change, no "rational factfinder" could conclude that the employer's explanation was a pretext for discrimination); *Gaffney v. Department of Information Technology and Telecommunications*, 536 F. Supp. 2d 445, 462 (SDNY 2008) (finding that "[b]usiness decisions to hire employees to fulfill specific needs in one area while downsizing another area during a reduction in force are generally not evidence of discrimination or pretext"). Plaintiff is also unable to demonstrate that she was singled out or treated differently on the basis of her lawsuit, since the record is clear that at least two other employees from her department, who received higher performance evaluations and were not suing the UAW, were also removed from their positions.

Finally, Ashton's statement to plaintiff in December of 2008 does not raise a question of fact as to pretext. Construing the facts in a light most favorable to plaintiff, Ashton told plaintiff he did not know how to answer the evaluation question concerning her feelings about the UAW because she was suing the UAW. While this statement indicates that Ashton was thinking about plaintiff's lawsuit at the time, the record is clear that Ashton never completed or returned the evaluation to Rapson or Bernath, nor was he involved in

the ultimate determination of which Special Assigned would be returned to their home plants. *See Fontecchio v. ABC Corp*., 12-CV-6998, 2015 U.S. Dist. LEXIS 7892 (Seibel, D.J.) (SDNY January 23, 2015) (no evidence of pretext presented in support of plaintiff's claim of discriminatory termination where plaintiff did not demonstrate that the individuals who made the discriminatory comments were involved in the termination). Even if there were evidence in the record that Ashton had influence over the decision to remove plaintiff from her Special Assigned position, which there is not, there is still insufficient evidence of pretext here. It is well established that plaintiff was one of many Special Assigned removed from their positions for economic and business reasons, and the record contains proof that at least two others removed from the same department as plaintiff had stronger performance evaluations and were not working at a remote location. Thus, the Court finds no reasonable fact finder could conclude that but-for plaintiff's EEOC charges and lawsuit, she would not have been removed from the position and returned to her home plant. *See Nassar*, 133 S.Ct. at 2528 (a plaintiff must prove that "the desire to retaliate was the but-for cause of the challenged employment action" in that "the adverse action would not have occurred in the absence of the retaliatory motive").

For these reasons, it is recommended that the Court grant summary judgment as to plaintiff's retaliation claims pursuant to Title VII and the NYSHRL.

## CONCLUSION

For the foregoing reasons, it is recommended that the Court deny defendants' motion for summary judgment as to plaintiff's discriminatory failure to hire claim under Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law. It is further

recommended that the Court grant defendants' motion for summary judgment as to all of plaintiff's remaining claims.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L.R.Civ.P. 72. Any requests for an extension of this deadline must be made to Judge Skretny.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See  Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y.  L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

DATED:     June 6, 2017
           Buffalo, New York

                                        /s/ Michael J. Roemer
                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge